UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

JENNY SCHIEBER,
    Plaintiff,

v.

UNITED STATES OF AMERICA,
    Defendant.

Civil Action No. 21-1371 (JDB)

---

## MEMORANDUM OPINION

Plaintiff Jenny Schieber challenges a decision by the United States Secretary of State ("Secretary") denying her claim for compensation from the Holocaust Deportation Fund ("Fund"). The Fund is a sum of money held in trust by the Secretary pursuant to an executive agreement between the governments of the United States and France; it is intended to compensate certain qualifying individuals who survived deportation from France during the Holocaust, or their survivors. See generally Def.'s Mot. to Dismiss Pl.'s Compl. Ex. A [ECF No. 6-2] ("Agreement" or "Ex. A").[1] Schieber claims that the Secretary's rejection of her claim was arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. See Compl. [ECF No. 1] ¶¶ 1–3. The United States responds that the Court lacks subject-matter jurisdiction over Schieber's claims and that she has failed to state a claim upon which relief can be granted. See Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss [ECF No. 6-1] ("Mot. to

---

[1] The Agreement is attached as an exhibit to defendant's motion to dismiss, and it is available in the Treaties and Other International Acts Series and electronically. See Agreement Between the Government of the United States and the Government of the French Republic on Compensation for Certain Victims of Holocaust-Related Deportation from France Who Are Not Covered by French Programs, Fr.-U.S., Dec. 8, 2014, T.I.A.S. 15-1101, https://www.state.gov/wp-content/uploads/2019/04/us_france_agreement.pdf. The Court will cite the Agreement's provisions as "Agreement art.#(#)" and prefatory materials as "Ex. A at #."

1

Dismiss") at 8–9.  For the reasons explained below, the Court will grant the government's motion to dismiss.

## Background

I. **The United States–France Agreement and the Holocaust Deportation Fund**

The United States and French governments entered into the Agreement on December 8, 2014.  Ex. A at 3.  France agreed to provide $60 million to create a fund—the Holocaust Deportation Fund—from which the United States government would "mak[e] payments," Agreement art. 4(1), to compensate "persons who survived deportation from France, their surviving spouses, or their assigns," id. art. 2(1).  The Agreement required the United States to deposit the money received from France "in an interest-bearing account . . . until distribution, pursuant to a determination by the Secretary of State of the United States of America or his designee."  Id. art. 4(4); see also 22 U.S.C. § 2668a (providing that the "Secretary of State shall determine the amounts due claimants" from "trust funds" consisting of "moneys received . . . from foreign governments . . . in trust for citizens of the United States or others").  In exchange for France's payment of money to establish the Fund, the United States agreed to recognize France's sovereign immunity, secure termination of suits pending against France in the United States concerning Holocaust deportation claims, and require future claimants to execute waivers of all rights against France.  See Agreement art. 5.

The United States, through the Secretary of State, "shall distribute the [Fund] . . . according to criteria which it shall determine unilaterally, in its sole discretion, and for which it shall be solely responsible."  Agreement art. 6(1); see id. art. 4(4).  Notwithstanding that broad grant of discretion, the Agreement requires the Secretary to reject any claims by persons "who have received, or are eligible to receive, compensation under an international agreement concluded by the Government of the French Republic addressing Holocaust deportation," id. art. 3(2), or under "another State's

2

program" for compensating Holocaust deportation victims, id. art. 3(4); accord id. art. 6(2)(b).  To determine whether a person is eligible to receive a payment from the Fund, the Secretary "shall rely on the sworn statement of nationality" to determine whether a claimant is a French national, and "sworn representations" that a claimant has not received compensation from other programs, "as well as on any relevant information" exchanged between the United States and French governments.  Id. art. 6(2)(c).[2]  Finally, the Agreement provides that "[a]ny dispute arising out of the interpretation or performance of this Agreement shall be settled exclusively by way of consultation between the parties."  Id. art. 8.  The Agreement "[e]ntered into force" on November 1, 2015.  Ex. A at 3.

## II. Factual Background

At the pleading stage, district courts must accept as true a plaintiff's factual allegations, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), so the Court will recite the facts as presented in the complaint.  Jenny Schieber is a citizen and resident of Israel.  Compl. ¶ 7.  On July 31, 1943, Schieber's mother was deported to Auschwitz, where she was later killed; Schieber's father, on the other hand, "survived and passed away in Antwerp, Belgium on August 1, 1964."  Id. ¶ 9.  After the Agreement was signed, Schieber filed a claim for payment from the Fund "on behalf of the estate of her father, a surviving spouse."  Id. ¶ 10.  In her application, Schieber swore that her father was "stateless," i.e., that he was not a citizen of any country.  Id.; see id. ¶ 14.

On April 3, 2018, however, the Secretary denied her claim.  Compl. ¶ 10.  Although Schieber "swore that the information in [her] application, including the information that her father

---

[2] The Annex to the Agreement ("Annex") is a "Form of Written Undertaking That Any Recipient of Compensation Must Execute Before Receiving Payment under This Agreement"—in other words, it is a template for the application that a claimant must submit to the Secretary to receive money from the Fund.  Annex at 1.  In the first paragraph of the form, a claimant must declare his or her nationality.  Id.  The claimant also must attach "a copy of government documentation establishing nationality" to the form, and must "declare under penalty of perjury" that he or she has not received, and will not claim, compensation under similar programs of France or any other nation.  Id. at 2.

was stateless, was true and correct," id. ¶ 11, and although she "provided a second affidavit, again swearing that her father was stateless, that he passed away in 1964, and that she did not have a copy of his death certificate," id. ¶ 12, the Secretary allegedly took "the position that [Schieber] had provided no evidence of the fact that her father was stateless," instead "stating that [the Department of State] had been unable to find proof of statelessness," id. ¶ 10.³

Schieber filed her complaint on May 18, 2021. See generally Compl. She claims that the Secretary's denial of her claim based on the rejection of her "sworn affidavits of nationality" was "an exercise of discretion which [the Secretary] did not have" because the Agreement provides that the Secretary "shall rely on the sworn statement of nationality" in determining eligibility for compensation. Id. ¶ 11 (quoting Agreement art. 6(2)(c)); see also id. ¶¶ 18–19 (claiming that the Secretary's decision "was not a reasonable interpretation of the Agreement"). Schieber also alleges that "the claims of other claimants who provided no more than sworn statements in support of their claims were approved," rendering the Secretary's decision "arbitrary and capricious." Id. ¶ 11. Further, she claims that the Secretary "arbitrarily and capriciously refused to accept basic principles of evidence" and ignored the "difficulty involved in trying to prove statelessness" by denying her claim despite her sworn statements and affidavits about her father's statelessness and death. Id. ¶¶ 13–16.

Schieber asks the Court to declare, pursuant to the APA and the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., that the denial of her claim "was arbitrary and capricious and should be

---

³ According to Schieber, nationals of five countries, including France and Belgium, "are excluded from the Agreement." Pl.'s Mem. in Opp'n to Mot. to Dismiss [ECF No. 9] ("Opp'n") at 1 n.1; see Agreement art. 3(1)–(2) (providing that the Agreement "shall not apply" to "French nationals" and "nationals of other countries who . . . are eligible to receive compensation under" other international agreements concluded by the French government); see also John Irish, France to Pay $60 Million for Holocaust Victims Deported by State Rail Firm, Reuters (Dec. 5, 2014, 12:26 PM), https://www.reuters.com/article/us-france-usa-holocaust/france-to-pay-60-million-for-holocaust-victims-deported-by-state-rail-firm-idUSKCN0JJ1TB20141205 ("The compensation deal . . . is open to people from all countries with the exception of . . . Belgium[,] which already ha[s] [a] bilateral agreement[] with France.").

4

overturned" and that her claim "should be approved based on the evidence" she provided and "the failure of Defendant to honor the terms of the Agreement," Compl. at 7. She also seeks a declaration that she is entitled to receive compensation "in the amount that would otherwise be paid . . . had she been initially approved as eligible," as well as "supplemental payments paid to all eligible claimants" of the same status. Id.

### III.   Motion to Dismiss

On July 27, 2021, the United States moved to dismiss Schieber's complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). See Mot. to Dismiss at 1–2. The government contends that the Agreement creates no private right of action, see id. at 9, but instead provides for resolution of disputes only through consultation between the United States and France—a provision that, the government argues, creates a "limitation on judicial review," id. at 9–10 (citing 5 U.S.C. § 702), precludes judicial review, id. at 13 (citing 5 U.S.C. § 701(a)(1)), and commits eligibility determinations "to agency discretion by law," id. at 14 (citing 5 U.S.C. § 701(a)(2)). The government also argues that Schieber's claims "raise a non-justiciable political question" as to the Department of State's interpretation and implementation of an international agreement. Id. at 17. Lastly, because "the Declaratory Judgment Act is not an independent source of federal jurisdiction," the government contends that Schieber's claims under that statute cannot survive on their own. Id. at 25.

In her opposition, Schieber protests that the government's arguments are "red herrings" because "the only issue" raised in her complaint "is whether a unilateral, internal administrative decision by the State Department" was "arbitrary and capricious." Pl.'s Mem. in Opp'n to Mot. to Dismiss Am. Compl. [ECF No. 9] ("Opp'n") at 2–3.[4] She contends that she is not "asking the

---

[4] The Court notes that Schieber has not moved to amend her complaint, nor has she filed an amended version.

5

Court to . . . mandate a particular interpretation of the Agreement," id. at 3, and that her allegations "are not based on the Agreement" but instead "are limited entirely to the Department of State's" actions, id. at 6.  Thus, she argues, the absence of a private cause of action in the Agreement cannot overcome the presumption of a right to sue under the APA.  Id. at 3–4; see id. at 6–10.  Further, Schieber claims that the Agreement is not a "law" by which a decision may be committed to an agency's discretion, see id. at 7, and she contends that the political question doctrine is "irrelevant" to her claims because she is only "seek[ing] to have the Defendant accept affidavits sworn to under penalty of perjury," see id. at 10–13.  In its reply, the government argues that Schieber's claims are indeed based on the Agreement, which is both "the basis for [her] alleged right to compensation" and the document that the Secretary allegedly misinterpreted in denying her claim.  Reply in Supp. of Mot. to Dismiss ("Reply") at 3 (citing Compl. ¶¶ 11, 19); see id. at 5–6.  The government's motion to dismiss Schieber's complaint is now fully briefed and ripe for decision.

## Analysis

In considering a motion to dismiss under Rule 12, a court must accept all facts alleged in the complaint as true and make all reasonable inferences in the plaintiff's favor.  Humane Soc'y of U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015).  Courts need not, however, "accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations."  City of Harper Woods Emps.' Ret. Sys. v. Olver, 589 F.3d 1292, 1298 (D.C. Cir. 2009).  To survive a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), a plaintiff must establish a court's jurisdiction by a preponderance of the evidence.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).  And to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the "complaint must contain sufficient factual matter . . . to 'state a claim to relief that is

plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Although a court may consider materials outside the pleadings to determine whether it has subject-matter jurisdiction over claims, Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005), a motion to dismiss for failure to state a claim must be decided only on the basis of "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the court] may take judicial notice," EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997). "Incorporation by reference can also amplify pleadings where the document is not attached by the plaintiff, but is 'referred to in the complaint and integral to the plaintiff's claim.'" Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (cleaned up) (quoting Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004). Thus, "[a] district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment." Id.

## I. Political Question Doctrine

The government's sole argument for dismissal for lack of subject-matter jurisdiction is that Schieber's claims present a nonjusticiable political question. See Mot. to Dismiss at 17. "The political question doctrine is 'essentially a function of the separation of powers,' and 'excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 840 (D.C. Cir. 2010) (first quoting Baker v. Carr, 369 U.S. 186, 217 (1962); and then quoting Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986)). And although many foreign policy decisions fall into this category, the Supreme Court has cautioned that "it is error to suppose that

every case or controversy which touches foreign relations lies beyond judicial cognizance." Baker, 369 U.S. at 211.  Instead, courts should undertake "a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." Id. at 211–12.

To aid in this analysis, Supreme Court articulated six factors that are "[p]rominent on the surface" of any case involving a non-justiciable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking an independent resolution without expressing lack of respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on the question.

Baker, 369 U.S. at 217.  The first two factors are "the most important," Harbury v. Hayden, 522 F.3d 413, 418 (D.C. Cir. 2008), but only one factor need be present for a court to conclude that a case is non-justiciable, Schneider v. Kissinger, 412 F.3d 190, 194 (D.C. Cir. 2005).

But despite the Supreme Court's enumeration of factors, the bounds of the political question doctrine remain "murky and unsettled." Harbury, 522 F.3d at 418 (quoting Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 803 n.8 (D.C. Cir. 1984) (Bork, J., concurring)).  The D.C. Circuit has noted that "[n]o branch of the law of justiciability is in such disarray as the doctrine of the political question," and because "there is no workable definition of characteristics that distinguish political questions from justiciable questions," the doctrine "is 'more amenable to description by infinite itemization than by generalization.'" Comm. of U.S. Citizens Living in Nicar. v. Reagan, 859 F.2d 929, 933 (D.C. Cir. 1988) (quoting Charles Allen Wright, The Law of

8

Federal Courts 74–75 (4th ed. 1983)).  Thus, the D.C. Circuit has explained that "applying the political question doctrine . . . may not be the best approach" to resolving certain issues.  Id. at 934.

In Committee of U.S. Citizens Living in Nicaragua, for example, plaintiffs sued the government on the ground that the United States' continued funding of the "Contras" in Nicaragua violated a judgment of the International Court of Justice ("ICJ") and therefore violated the APA, the United Nations Charter, international law, and various constitutional provisions.  See 859 F.2d at 932.  Although the government sought to dismiss the suit on political question grounds, the D.C. Circuit held that the case "invite[d] dismissal for a reason more fundamental than the political question doctrine":  none of the plaintiffs "ha[d] a cause of action in an American court."  Id. at 934.  Thus, the D.C. Circuit "d[id] not rest on the political question doctrine in rejecting the claims," and instead affirmed dismissal "on the ground that private parties have no cause of action in this court to enforce" an ICJ decision.  Id.; see also Sanchez-Espinoza v. Reagan, 770 F.2d 202, 206 (D.C. Cir. 1985) (opting "not to resort to [the political question] doctrine for most of [plaintiffs' claims]" because there were "other bases for dismissing the suit . . . which do not expand [the court's] jurisdiction by resolving the assertedly political question on its merits")).

Cognizant of the marked difficulty in deciding "[j]ust where the non-justiciability line is drawn," and of "the D.C. Circuit's hesitance to apply the ill-defined and nebulous political question doctrine," another court in this District "decline[d] to apply the doctrine" in an analogous case and instead "address[ed] the other grounds for dismissal asserted by" the defendants.  Gonzalez-Vera v. Kissinger, Civ. A. No. 02-02240 (HHK), 2004 WL 5584378, at *3–4 (D.D.C. Sept. 17, 2004) (collecting D.C. Circuit cases affirming dismissals on grounds other than the political question doctrine).  Guided by the D.C. Circuit's preference to resolve a case on the basis of whether

9

plaintiffs had "a cause of action in an American court" instead of addressing the political question doctrine, see Comm. of U.S. Citizens Living in Nicar., 859 F.2d at 934, the Court will therefore reserve judgment on the government's political question argument and instead consider whether Schieber has a cause of action to raise her claims in this Court.

## II. Private Right of Action

The government argues that, because the Agreement provides no private cause of action, it imposes a "limitation on judicial review" and leaves Schieber without a cause of action. Mot. to Dismiss at 9–10 (quoting 5 U.S.C. § 702). Schieber responds that the government's premise—that her claims "are based on the Agreement"—"is clearly wrong." Opp'n at 5. She argues instead that she "seeks a judgment against the [government] only for domestic wrongs committed by the Department of State," id. at 3–4, so her "right of action is specifically created by the APA subject only to specified exceptions," none of which are applicable in her case, id. at 6. The Court will first determine whether Schieber's claims are based on the Agreement, then decide whether the Agreement provides a private cause of action, and, if not, whether that is fatal to Schieber's claims.

### A. Basis of Schieber's Claims

In her opposition to the government's motion to dismiss, Schieber contends that she is not "asking the Court to . . . mandate a particular interpretation of the Agreement," Opp'n at 3, or to "interpret any terms of the Agreement," id. at 4. Instead, she argues that she has "suffered financial injury only because of the internal acts of the Department of State," which "rejected her claim based on conclusions of fact that lacked rational justification." Id.; see also id. at 6 ("Th[is] dispute has nothing to do with the terms of the Agreement."). She also claims that she "does not rely on the Agreement as the source of [her] cause of action against the State Department." Id. at 4–5.

10

But these arguments are inconsistent with the allegations in Schieber's complaint. Schieber alleged that the "language of the Agreement itself was a mandate" requiring the Secretary to accept sworn affidavits of nationality, and that it was the Secretary's "[f]ailure to treat [Schieber] in accordance with the terms of the Agreement" that rendered the Secretary's decision "arbitrary and capricious." Compl. ¶ 11 (emphases added). Furthermore, Schieber explicitly claimed that the Secretary's rejection of her claim "was not a reasonable interpretation of the Agreement," id. ¶ 19. Indeed, Schieber acknowledges the centrality of the Agreement in her opposition to the motion to dismiss: "To the extent that the Agreement is relevant to this suit, it is only because Plaintiff is asking the Defendant to adhere to the purpose and language of the Agreement." Opp'n at 12 (emphasis added).

Nor does Schieber raise any other source of law as the basis of her suit. Although she contends that the Secretary "arbitrarily and capriciously refused to accept basic principles of evidence," citing Federal Rules of Evidence 602, 803(10), and 1004(b),[5] Compl. ¶ 13, she does not explain why those rules, which only "apply to proceedings in United States courts," Fed. R. Evid. 101(a), are relevant to the Secretary's decision. Schieber also contends that the Secretary "ignore[d] internationally accepted guidelines on the definition and treatment of stateless persons," Opp'n at 2 & n.2; see Compl. ¶¶ 14–16, but those guidelines are not a legal basis for claims against the Secretary under the APA. The Court concludes that Schieber's claims are based on the

---

[5] Federal Rule of Evidence 602 provides that a witness may testify only on a matter within his or her personal knowledge, and that "[e]vidence to prove personal knowledge may consist of the witness's own testimony." Rule 803(10) creates an exception to the general rule against hearsay for testimony "that a diligent search failed to disclose a public record," if that testimony is admitted to prove that "the record . . . does not exist" or that the "matter did not occur or exist, if a public office regularly kept a record or statement for a matter of that kind." Finally, Rule 1004(b) provides that a non-original writing is admissible if "an original cannot be obtained by any available judicial process." Drawing from these rules, Schieber argues that the Secretary should have considered her "personal knowledge of the date of her father's death" and her sworn statement that she has been unable to locate a death certificate for over 55 years. Compl. ¶ 13.

11

Agreement and will thus consider whether the Agreement provides a private right of action and, if not, whether it imposes a "limitation on judicial review" under the APA.

### B. Limitation on Judicial Review

A person who is "suffering a legal wrong because of agency action . . . is entitled to judicial review thereof," 5 U.S.C. § 702, and the Court must "set aside agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law," id. § 706(2)(A). But nothing in the APA "(1) affects other limitations on judicial review or the power or duty of the court to dismiss any action . . . on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." Id. § 702. Although treaties and executive agreements have the force of law, violations of them are "subject to review under the APA" only "when a private right of action is afforded." De la Torre v. United States, Nos. C 02–1942 CRB, C 01–0892–CRB, C 02–1943–CRB, C 02–1944–CRB, 2004 WL 3710194, at *8–9 (N.D. Cal. Apr. 14, 2004); cf. McKesson Corp. v. Islamic Republic of Iran, 539 F.3d 485, 488–89, 491 (D.C. Cir. 2008) (although Treaty of Amity between United States and Afghanistan had the force of law, plaintiff could not bring suit for alleged violation because treaty lacked "a textual invitation to judicial participation"). Thus, whether a treaty or executive agreement carries the force of law is a separate issue from whether it affords a private right of action. See McKesson Corp., 539 F.3d at 488–89 ("[W]hether a treaty is self-executing is a question distinct from whether the treaty creates private rights or remedies." (quoting Restatement (Third) of Foreign Relations Law of the United States § 111 cmt. h (Am. Law Inst. 1986))).

There is a presumption that international agreements do not create private causes of action. See Medellín v. Texas, 552 U.S. 491, 506 n.3 (2008); McKesson Corp., 539 F.3d at 488–89; Mora

12

v. New York, 524 F.3d 183, 201 & n.25 (2d Cir. 2008) (collecting cases).  This presumption may "be overcome only if the agreement itself reflects an intent to create judicially enforceable private rights."  United States v. Sum of $70,990,605, 234 F. Supp. 3d 212, 237–38 (D.D.C. 2017) (citing Restatement (Third) of Foreign Relations Law of the United States § 907 cmt. a (Am. Law Inst. 1986)); accord Restatement (Fourth) of Foreign Relations Law of the United States § 311 cmt. b (Am. Law Inst. 2018).  Without a "textual invitation to participation," therefore, a treaty or agreement is enforceable only "through bilateral interaction between its signatories" and not by the adjudication of private suits.  McKesson Corp., 539 F.3d at 491 (also giving "'great weight' to the fact that the United States shares this view" (quoting Medellín, 552 U.S. at 513)).

The government correctly notes that the Agreement "contains no express provisions creating judicially enforceable rights for claimants" and argues that the "Agreement's text and context" support the same conclusion.  Mot. to Dismiss at 12.  Textually, the Agreement provides that the United States shall distribute funds "according to criteria which it shall determine unilaterally, in its sole discretion, and for which it shall be solely responsible," Agreement art. 6(1) (emphasis added), and that "[a]ny dispute arising out of the interpretation or performance of this Agreement shall be settled exclusively by way of consultation between the Parties," that is, between the United States and France, id. art. 8 (emphasis added).

As to context, although the Agreement was intended to benefit individual claimants—Holocaust survivors and their qualifying family members, see Agreement art. 2(1)—the relevant question is whether anything in the Agreement "indicate[s] an intent by its creators that any of [its] terms . . . would give rise to affirmative, judicially-enforceable obligations on behalf of" individual claimants.  De la Torre, 2004 WL 3710194, at *10; see also McKesson Corp., 539 F.3d at 489 (concluding that treaty provided no private cause of action, even though it "directly benefit[ted]"

the plaintiff, because it "le[ft] open the critical question of how [plaintiff] is to secure its due"). For instance, the court in De la Torre concluded that a series of agreements between the United States and Mexico, which were intended to improve working conditions for certain Mexican citizens in the United States, were not enforceable by the workers. See 2004 WL 3710194, at *1–2. "[D]espite the multitude of provisions that provided protections to the [workers]," the court concluded that "nothing in the agreements expresses or allows the court to infer that" the purposes or objectives of the treaty "warrant[ed] a private right of action." Id. at *9. Instead, the court reasoned "that what was contemplated by the agreements were matters of states for the respective nations to enforce between them." Id. at *10. So too here. Although the Agreement's objectives include compensation for private parties, its text and context indicate that it is not intended to be enforceable by those parties. Thus, the Court concludes that the Agreement provides no private cause of action, so Schieber cannot state a claim under the APA for the Secretary's alleged violation of the Agreement.[6] This lack of a cause of action is an independent limitation on judicial review of the State Department's denial of Schieber's claim.

### III.     Preclusion of Review and Commitment to Agency Discretion

Even assuming that the Agreement did not operate as a limitation on judicial review under 5 U.S.C. § 702, the Court would still conclude that it precludes judicial review under § 701(a)(1). See Mot. to Dismiss at 13–14. Schieber urges that the Agreement's provision limiting dispute resolution to consultation between the United States and France does not apply to her claims, which are limited to the Secretary's actions, see Opp'n at 6, and she argues that the government has

---

[6] Without a viable claim under the APA, Schieber also cannot state a claim under the Declaratory Judgment Act. If a plaintiff fails to allege "a cognizable cause of action," she has "no basis upon which to seek declaratory relief because of the "well-established rule that the Declaratory Judgment Act is 'not an independent source of federal jurisdiction.'" Ali v. Rumsfeld, 649 F.3d 762, 778 (D.C. Cir. 2011) (quoting C & E Servs., Inc. of Washington v. D.C. Water & Sewer Auth., 310 F.3d 197, 201 (D.C. Cir. 2002)).

identified no law that "prohibit[s] review," id. at 7.  The Court disagrees:  the Agreement itself precludes judicial review.

The APA provides no cause of action for a person injured by allegedly unlawful agency action "to the extent that statutes preclude judicial review."  5 U.S.C. § 701(a)(1).  "Executive agreements are not quite treaties," in that they do not require ratification by the Senate, but they do "carry the force of law as an exercise of the President's foreign policy powers."  Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp., 724 F.3d 230, 232 (D.C. Cir. 2013).[7]  In the context of the APA, courts have concluded that treaties, just like statutes, may preclude judicial review under § 701(a).  See United States v. Moloney (In re Price), 685 F.3d 1, 13–14 (1st Cir. 2012), cert. denied, 569 U.S. 942 (2013).

Under § 701(a)(1), the APA's presumption of reviewability of agency action "may be overcome by specific language" or by "inferences of intent drawn from the statutory scheme as a whole."  Block v. Cmty. Nutrition Inst., 467 U.S. 340, 349 (1984); see also Heckler v. Cheney, 470 U.S. 821, 830 (1985) (Section 701(a)(1) applies "when Congress has expressed an intent to preclude judicial review").  Thus, "[w]hether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from" its structure, objectives, history, and the nature of the agency action involved.  Block, 467 U.S. at 345; see also Moloney, 685 F.3d at 13 (applying the same principle to an APA challenge under a mutual legal assistance treaty ("MLAT")).

For many of the reasons explained above, the Court concludes that the Agreement precludes judicial review of Schieber's claim.  That claim is based on the Secretary's allegedly

---

[7] Schieber argues that the Agreement is not "the equivalent of law," Opp'n at 7, but she neither cites any support for this position nor grapples with binding Circuit precedent to the contrary.  See Owner-Operator Indep. Driver's Ass'n, 724 F.3d at 232; cf. McKesson Corp., 539 F.3d at 488 (concluding that Treaty of Amity had the force of law).

incorrect interpretation of the Agreement, see, e.g., Compl. ¶ 19; Opp'n at 12, and the Agreement provides for exclusive resolution of "[a]ny dispute arising out of the interpretation or performance of the Agreement" by "consultation" between the United States and France, Agreement art. 8. That consultation-only provision operates as law precluding judicial review. See Moloney, 685 F.3d at 13–14. In Moloney, the First Circuit considered an APA challenge to the government's decision to subpoena information pursuant to an MLAT with the United Kingdom. Id. at 3, 13. Because the MLAT explicitly did "not give rise to a right on the part of any private person to . . . impede the execution of a request [for legal assistance]," instead providing that the United States and United Kingdom would "consult promptly . . . concerning [its] implementation," id. at 10–11, and because its structure and objectives suggested the same, id. at 11–12, the court concluded that § 701(a)(1) "bar[red] federal court jurisdiction," id. at 13–14. So too here. Schieber resists this conclusion by arguing that her challenge is only directed at the Secretary's rejection of her claim and "has nothing to do with the terms of the Agreement." See Opp'n at 6. But, as explained above, the Court concludes that Schieber's claims are based on her disagreement with the Secretary's interpretation of the Agreement. See Moloney, 685 F.3d at 13 (rejecting an analogous argument that plaintiffs "s[ought] . . . merely to enforce the treaty requirements"). Because any dispute about the "interpretation" of the Agreement must be resolved by intra-party consultation, the consultation-only provision of the Agreement precludes judicial review in this case.

## Conclusion

For the foregoing reasons, the Court will grant the government's motion to dismiss Schieber's complaint. An Order to that effect shall issue on this date.

                                                        /s/
                                     JOHN D. BATES
                          United States District Judge

Dated: January 26, 2022